******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* EDDIE A. PEREZ
(SC 19285)

Rogers, C. J., and Palmer, Zarella, McDonald, Robinson and Vertefeuille, Js.

*Argued October 13, 2015—officially released July 26, 2016*

*Harry Weller*, senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, *Michael Gailor*, executive assistant state's attorney, and *Christopher Alexy*, senior assistant state's attorney, for the appellant (state).

*Hubert J. Santos*, with whom were *Jessica M. Santos* and *Trent A. LaLima*, for the appellee (defendant).

*Opinion*

PALMER, J. This appeal raises the question of whether the trial court's refusal to sever two unrelated criminal cases brought against the defendant, Eddie A. Perez, previously joined for trial for purposes of judicial economy, improperly compromised the defendant's right to choose whether to testify on his own behalf in one of the cases but to remain silent in the other. The Appellate Court concluded that it did, reversed the judgments of conviction and remanded the cases to be retried in two separate proceedings.[1] *State* v. *Perez*, 147 Conn. App. 53, 93, 124, 80 A.3d 103 (2013). Thereafter, the state, on the granting of certification, appealed, contesting the propriety of this determination.[2] It contends, inter alia, that the defendant's first request to sever the cases was accompanied by an inadequate offer of proof as to his need to testify and that a second request, although sufficiently detailed, was untimely. We conclude that the defendant timely made a compelling showing that he had important testimony to give in one case and a strong need to refrain from testifying in the other and, therefore, that the trial court had abused its discretion in declining to sever the cases.[3] Accordingly, we affirm the judgment of the Appellate Court.

Following a jury trial, the defendant, the former mayor of the city of Hartford (city), was convicted of bribe receiving, fabricating evidence and larceny by extortion for actions he had taken while in office.[4] The state had charged the defendant with these offenses in two separate informations but, before trial, moved to consolidate the charges. The trial court granted the state's motion to consolidate over the defendant's objection, and the cases were tried together before a single jury.

The Appellate Court's opinion provides a detailed rendition of the facts underlying the defendant's convictions, which need not be repeated in this opinion. See id., 66–77, 82–88. For present purposes, however, it is necessary to briefly summarize the facts underlying the case involving the bribery and fabrication charges (bribery case).[5] The defendant was convicted of bribe receiving for accepting free home improvement services from a contractor, Carlos Costa, in exchange for the defendant's assisting Costa in connection with certain problems that Costa had encountered while his company, USA Contractors, performed a construction contract for the city. Specifically, the defendant assisted Costa by requesting that the city treasurer expedite some payments due to USA Contractors and by interfering with efforts of the Hartford Department of Public Works (department) to manage the construction contract and to call USA Contractors' performance bond due to insufficient performance, an action that would have removed USA Contractors from the city construction project and

impaired its ability to do business with the city in the future. The defendant also was convicted of fabricating evidence in connection with his request that Costa create a bill for the home improvement work only when an investigation into the propriety of that work had commenced or was imminent.

The state's presentation of evidence in the bribery case, which preceded its presentation of evidence in the larceny by extortion case (extortion case), included the following. Department employees and outside consultants the department hired testified that USA Contractors had performed the construction contract with the city poorly and behind schedule, and that it had submitted baseless claims for additional payments. At some point, at the defendant's behest, the city's director of capital projects became involved to mediate issues that arose between the department and USA Contractors. Ultimately, because performance remained inadequate, the foregoing individuals together decided to contact USA Contractors' bonding company and to report the performance issues for the purpose of calling the bond and terminating the contract between the city and USA Contractors. When Costa informed the defendant that a letter to this effect had been sent, the defendant became upset. Thereafter, the director of capital projects wrote another letter to the bonding company rescinding the first letter, without seeking the approval of the others involved in the earlier decision. USA Contractors remained on the job and finished the project well beyond the time period contemplated by the contract with no further action taken on its performance bond.

Costa testified for the state. He agreed that he had sought the defendant's assistance with the city's expeditious payment of certain amounts due under the construction contract and with the rescission of the department's letter to USA Contractors' bonding company, but, in his view, those actions were wholly justified because he was being treated unfairly and also had experienced problems with late payments by the city. He attributed many of the problems and delays associated with the project to the department, and others to circumstances that were beyond his control. Costa since had sued the city for breach of the construction contract, seeking substantial damages. He believed that the consultants the department had hired operated under a conflict of interest due to their prior involvement in the design of the project. Costa, who had a history of successfully performing other work for the city, had been acquainted with the defendant for a considerable period of time prior to any of the events in question, and considered him a friend. In addition, Costa previously had campaigned and raised funds for the defendant.

Damningly to the defendant, however, Costa also tes-

tified that, around the time he sought assistance from the defendant for the problems he was experiencing with the construction project, he was performing kitchen and bathroom renovations at the defendant's private residence without receiving any payment for such work. He confirmed that he never prepared a quote, took a deposit or expected to get paid for those renovations. Costa explained that he performed this work for free because the defendant was the mayor and his friend, he considered the work to be a cost of doing business with the city and he believed it would provide him with greater access to the defendant. According to Costa, the defendant did not begin to approach him about a bill until approximately one year after the work was completed, when rumors about the work began circulating in the community. Costa could not immediately provide the defendant with a bill because he had not kept records for the renovation work, believing that he would not be paid for it. He gave the defendant a bill several months later, however, and the defendant paid Costa several months after that.

A number of materials suppliers and construction workers testified to provide detail about the work performed at the defendant's residence and its substantial cost. Their testimony established that the amount the defendant ultimately paid for the home renovations was well below market rate. An employee of The Home Depot (Home Depot) testified that the defendant and his wife, prior to the work being done at their residence, had entered into an agreement with Home Depot to provide similar services but thereafter cancelled that agreement, purportedly because they had received a lower offer. The defendant's executive assistant testified that the defendant would at times meet or speak with Costa when Costa visited or called the defendant's office but that, at other times, he was not available to Costa. The city treasurer confirmed that the defendant's office requested several times that USA Contractors receive expedited payment for its construction work, and that checks were issued after auditing protocols ensured that payment was proper. A city employee testified that building permits were not issued for the work performed at the defendant's home prior to its completion. A city merchant testified that he had heard from a worker at the defendant's home that the work there had been done for free and without permits, and that he thereafter began telling many people in the community, including the defendant's political opponents, about what he had heard.

Finally, Michael Sullivan, a former investigator with the public integrity unit of the Office of the Chief State's Attorney, testified about the investigation that had led to the defendant's arrest. Sullivan had arranged to meet with the defendant and to interview him about the events underlying the extortion case but, at some point, heard the rumors about Costa's free home improvement

work for the defendant. The interview occurred with the city's corporation counsel also in attendance. At the conclusion of the interview, Sullivan asked the defendant whether USA Contractors had performed bathroom and kitchen renovations for him, and the defendant replied that it had. The defendant falsely claimed that he had paid for the work approximately one and one-half years prior to the interview, which was fairly close to the time the renovation work had been completed. Sullivan testified that, at this point in the interview, the defendant became noticeably nervous. The defendant agreed to provide Sullivan a copy of the cancelled check with which he purportedly had paid, but, after some delay, the defendant ultimately provided documentation indicating that he had applied for a home equity loan hours after he had met with Sullivan and subsequently paid for the renovation work with the proceeds of that loan. The defendant also provided the invoice Costa had prepared for the work several months beforehand, which Sullivan determined to be fabricated in that it was created after the fact and lacked supporting documentation. Sullivan's investigation also yielded records of telephone or cell phone calls between Costa and the defendant around the time USA Contractors received expedited payments from the city and the time the second letter was sent to USA Contractors' bonding company. Sullivan also testified that he secretly had recorded his interview with the defendant, and the recording was introduced into evidence.[6]

The defense case largely was presented through cross-examination of the state's witnesses. Otherwise, the defendant's chief of staff testified for the defense, explaining that the defendant's wife had encountered a serious medical issue when the renovation work was being performed at the defendant's home, that she underwent multiple surgeries at different hospitals in the six month period thereafter, and that the defendant experienced difficulties in getting the family's health insurer to pay all of the resulting bills. He testified further that the defendant was very concerned and distracted by these occurrences, and that he also was busy with his mayoral duties. The chief of staff confirmed that the defendant and Costa were acquainted prior to the events in question due to Costa's campaign and fundraising assistance. He also testified that the defendant, as a general matter, prioritized supporting minority run businesses such as Costa's and would assist in getting them paid by the city. As to the bribery case, the only other witness whom the defense called was the construction worker who purportedly reported the free and unpermitted work being done at the defendant's residence. When called to the stand, he denied having done so and also stated that, in the entire time he had been at the defendant's residence, he had seen the defendant there only once.

In his memorandum in opposition to the state's pretrial motion to consolidate, the defendant briefly mentioned that consolidation would affect his ability to exercise his right to testify but did not elaborate. On May 18, 2010, near the end of the state's presentation of its evidence in the bribery case, defense counsel notified the court and the assistant state's attorneys (state) that, when the state concluded its evidence in that case, he would be moving to sever the two cases on the ground that the defendant wished to testify in the bribery case but not in the extortion case. Defense counsel stated that this decision was based on his assessment of Costa as a witness for the prosecution, an assessment he could not have made prior to trial. The state indicated that it was opposed to severance as "not appropriate," arguing that the defendant, in previously arguing against consolidation, had not claimed that he wanted to testify in one case but not the other. In the state's view, the defendant had failed to make the determination as to whether he would testify in a timely fashion, and, therefore, severance was not warranted. The court, for its part, agreed that "[i]t's something that probably should have been raised and highlighted a lot earlier."

On May 20, 2010, at the close of the state's bribery case, the defendant filed a motion to sever pursuant to Practice Book § 41-18 (first motion to sever). In addition to reiterating his previous arguments raised in his memorandum in opposition to the state's motion to consolidate, which pertained to the *Boscarino* factors,[7] he expressly claimed that he was prejudiced substantially by the consolidation because he wished to testify in the bribery case but to exercise his constitutional right not to testify in the extortion case. In his first motion to sever, the defendant described the testimony that he would give in the bribery case as follows: (1) "[t]he defendant's reasons for misleading . . . Sullivan during their initial interview on June 27, 2007"; (2) "[h]ow . . . Costa became involved in the defendant's home renovation project, details regarding when [the defendant] first approached . . . Costa and requested a bill, the number of times that [the defendant] personally followed up with Costa regarding his request, and the reasons for his delay in payment"; (3) "[t]he context of [the defendant's] involvement in the [second] letter . . . [to USA Contractors' bonding company] regarding the [city construction] project"; and (4) "[t]he context of [the defendant's] involvement in the issuing of [expedited payments] from the [city] treasurer . . . to USA Contractors." The defendant also contended in the first motion to sever that his "testimony on these points, at a minimum, will be absolutely critical for the jury's complete assessment of both his intent, as well as interactions that he alone may have had with . . . Costa. Thus, [the defendant's] ability to exercise his right to testify is critical because he is the sole source of infor-

mation on these points." The first motion to sever also provided reasons why the defendant did not wish to testify in the extortion case, namely, that his version of the underlying facts in that case would be presented to the jury through his recorded interview with Sullivan, making his live testimony unnecessary, particularly since it would expose him to a risk of prejudicial cross-examination regarding uncharged misconduct that related only to the extortion case.[8]

When the first motion to sever was argued on May 20, 2010, defense counsel reiterated that his assessment of the defendant's need to testify in the bribery case had not crystallized until he had heard the state's presentation of its evidence and could evaluate the credibility of the witnesses. According to defense counsel, it was then clear that the defendant had to testify in order to have a chance of acquittal in the bribery case. The state, in response, argued that Connecticut case law indicated that motions to sever based on a defendant's wish to testify selectively should be raised pretrial, and that the defendant should have made his argument in this regard at the time of the state's motion to consolidate. In the state's view, the defendant was making an improper and untimely "attempt . . . to control the course of the case," and, moreover, it was unnecessary for the defendant to testify because the matters he had identified had been addressed adequately on cross-examination of various witnesses. After a colloquy between the court and counsel regarding the fact that our jurisprudence, at the time, supported a presumption in favor of joinder,[9] the court rejected the defendant's claim that his constitutional right to testify could outweigh the interest in judicial economy. Notably, the court never determined that the defendant's testimonial proffer was inadequate for it to balance those two interests, nor did it remark on the substance of that proffer.

Thereafter, on June 9, 2010, following the state's presentation of its evidence in the extortion case, the defendant renewed his arguments in a second motion to sever.[10] After a June 11, 2010 hearing at which counsel provided extensive detail as to the defendant's planned testimony in the bribery case,[11] the trial court again declined to sever the cases, reasoning that the jury had been instructed repeatedly to consider the two cases separately and that the defendant remained free to testify in only one case if he so chose, with any cross-examination limited to the case about which he testified.

On appeal to the Appellate Court, the defendant argued, inter alia, that the trial court's denial of his motions to sever was improper because it constrained his right to testify; see *State* v. *Perez*, supra, 147 Conn. App. 93, 113; and the entire panel of that court hearing the case, although split on the question of whether the cases had been improperly joined, agreed. See id., 113;

id., 124–25 (*Lavine, J.,* concurring). Specifically, the panel concluded that the trial court's refusal to sever the cases midtrial had compromised the defendant's ability to testify in the bribery case, causing him substantial prejudice. Id., 113; id., 124–25 (*Lavine, J.,* concurring). We agree with the Appellate Court that the trial court abused its discretion in declining to sever the cases because the defendant's first motion to sever was filed timely and constituted a compelling showing that he had important testimony to give in one case and a strong need to refrain from testifying in the other.

It long has been recognized that joinder of unrelated criminal charges can cause unfair prejudice when it "embarrasses or confounds an accused in making his defense." (Internal quotation marks omitted.) *Cross* v. *United States*, 335 F.2d 987, 989 (D.C. Cir. 1964). For example, "[p]rejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence. His decision whether to testify will reflect a balancing of several factors with respect to each count: the evidence against him, the availability of defense evidence other than his testimony, the plausibility and substantiality of his testimony, [and] the possible effects of demeanor, impeachment, and cross-examination. But if the two charges are joined for trial, it is not possible for him to weigh these factors separately as to each count. If he testifies on one count, he runs the risk that any adverse effects will influence the jury's consideration of the other count. Thus he bears the risk on both counts, although he may benefit on only one. Moreover, a defendant's silence on one count would be damaging in the face of his express denial of the other. Thus he may be coerced into testifying on the count [on] which he wished to remain silent." (Footnotes omitted.) Id.

"[B]ecause of the unfavorable appearance of testifying on one charge while remaining silent on another, and the consequent pressure to testify as to all or none, the defendant may be confronted with a dilemma: whether, by remaining silent, to lose the benefit of vital testimony on one count, rather than risk the prejudice (as to either or both counts) that would result from testifying on the other. Obviously no such dilemma exists [when] the balance of risk and advantage in respect of testifying is substantially the same as to each count." *Baker* v. *United States*, 401 F.2d 958, 976 (D.C. Cir. 1968).

Undue prejudice will not invariably result from a decision to testify selectively. Consequently, "[a]n accused's election to testify on some but not all of the charges on trial does not automatically require a severance." (Internal quotation marks omitted.) *State* v. *King*, 187 Conn. 292, 304, 445 A.2d 901 (1982), overruled in part on other grounds by *State* v. *Payne*, 303

Conn. 538, 34 A.3d 370 (2012). Rather, the matter remains within the trial court's discretion, "though a discretion within limits narrowly confined by the exigencies of the situation. In the end, it is incumbent [on] the judge to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying, and to grant or deny the severance accordingly." (Internal quotation marks omitted.) *State* v. *King*, supra, 304. Although "trial courts must be afforded reasonable latitude in exercising discretion in these matters, [it bears emphasis] that compromise of a defendant's fundamental right to a fair trial free of undue prejudice as the quid pro quo for the mere expeditious disposition of criminal cases will not be tolerated." *People* v. *Lane*, 56 N.Y.2d 1, 8, 436 N.E.2d 456, 451 N.Y.S.2d 6 (1982).

In *State* v. *Schroff*, 198 Conn. 405, 408–409, 503 A.2d 167 (1986), we adopted the analysis that federal courts use when a criminal defendant contends that severance of the charges is necessary because he or she wishes to testify as to some charges but not as to others. Pursuant to that approach, "no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and [a] strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant present enough information— regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying." (Internal quotation marks omitted.) Id., 409, quoting *Baker* v. *United States*, supra, 401 F.2d 977.

We conclude that the trial court improperly denied the defendant's first motion to sever because the motion was timely filed and his accompanying proffer, as to his need to testify in the bribery case, was sufficient to meet the foregoing standard. At that point in the proceedings, the defendant adequately demonstrated that his interest in testifying on his own behalf in the bribery case outweighed the considerations of judicial economy that had justified joinder at the outset of trial.

The defendant was convicted of receiving a bribe pursuant to General Statutes § 53a-148 (a), which provides in relevant part: "A public servant . . . is guilty of bribe receiving if he solicits, accepts or agrees to accept from another person any benefit for, because of, or as consideration for his decision, opinion, recommendation or vote." A distinguishing feature of the crime of bribery, with respect to the recipient of a bribe, is that it "requires intent . . . to be influenced in an

official act . . . ." (Internal quotation marks omitted.) *United States* v. *Sun-Diamond Growers of California*, 526 U.S. 398, 404, 119 S. Ct. 1402, 143 L. Ed. 2d 576 (1999).[12] "In other words, for bribery there must be a quid pro quo—a specific intent to . . . receive something of value *in exchange* for an official act." (Emphasis is original.) Id., 404–405. Stated otherwise, the benefit that the public official receives is "the prime mover or producer of [his or her] official act." (Internal quotation marks omitted.) *United States* v. *Strand*, 574 F.2d 993, 995 (9th Cir. 1978). If direct evidence of the requisite intent is unavailable, it may be established, as it was in the present case, by circumstantial evidence. See, e.g., *United States* v. *Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). "The quid pro quo requirement is satisfied [as] long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor." (Emphasis in original; internal quotation marks omitted.) Id.

Under the law governing bribery, it was essential for the state to prove, beyond a reasonable doubt, that the defendant had accepted a benefit from Costa, namely, free home improvement services. The state also needed to prove, beyond a reasonable doubt, that the defendant undertook one or more official acts, such as interfering with the department's decisions to call USA Contractors' bond and to remove USA Contractors from the job, or requesting that the city treasurer expedite payments due to USA Contractors, *in exchange* for that benefit. Stated otherwise, the state needed to show that the motivating force for the defendant's taking of these actions was his receipt of a benefit from Costa, and not his independent judgment that the actions were a proper and warranted exercise of his mayoral authority.

When the state rested in the bribery case, its evidence tended to show that (1) the defendant received substantial home improvement services from Costa, with whom he previously was friendly, without any advance payment or an agreed on price, (2) at various times in the two years that followed, the defendant assisted USA Contractors, Costa's business entity, in getting paid and remaining on the city construction contract, despite USA Contractors' questionable performance, (3) the defendant did not get a bill for the home improvement services until more than one year after they were completed, and that bill stated an amount that was below market cost for the services rendered, (4) the defendant did not pay the bill until several months later, after he was questioned by an investigator, and (5) the defendant, when questioned by that investigator, appeared nervous and falsely reported that he previously had paid for the services. Without an effective rebuttal by the defense, the state's proof that the defendant had received a benefit from Costa in exchange for official acts was quite strong.

We conclude that the defendant's description in his first motion to sever of the testimony that he would give, when viewed against the foregoing evidence offered by the state, adequately enabled the trial court to weigh the defendant's interest in testifying against the countervailing consideration of judicial economy and, moreover, that the trial court's denial of the defendant's request for severance at that point was an abuse of discretion that prejudiced the defendant substantially. To begin, it bears emphasis that the trial court, in denying the first motion to sever, did *not* state that the defendant's testimonial proffer was in any way inadequate for it to engage in that balancing of interests, nor did it even comment on the substance of that proffer. Rather, the court appeared to deny the first motion to sever on the basis of untimeliness and general deference to the presumption in favor of joinder that existed at the time the cases were tried. Impairment of the choice whether to testify, however, is a recognized form of prejudice that may override that presumption in certain circumstances.[13] Under our rules of practice and jurisprudence, the defendant was entitled to request severance on this basis midtrial, and it was "incumbent [on] the [court] to weigh the considerations of economy and expedition in judicial administration against the defendant's interest in having a free choice with respect to testifying,[14] and to grant or deny the severance accordingly." (Footnote added; internal quotation marks omitted.) *State* v. *King*, supra, 187 Conn. 304.

Next, the defendant's proffered testimony clearly had the potential to undermine the state's evidence of bribery and, therefore, to provide the defendant a meaningful chance of an acquittal on that charge. Specifically, the defendant proposed to testify regarding when he first sought a bill from Costa, the number of times he followed up on that request and the reasons for his delay in payment. He also offered to provide an explanation as to why he had misled Sullivan regarding the timing of his payment. If the defendant could convince the jury that he had intended to pay for the renovation work all along, that he had attempted to do so much earlier than the state had contended and that he had a good reason for the delay in payment, it would rebut the evidence that the defendant had accepted a benefit from Costa, an essential element of bribery.[15]

With respect to the defendant's false statement to Sullivan, we agree with the Appellate Court's apt assessment that "[t]he need to rehabilitate [that untruth] is evident, and, to do that, the defendant's testimony was required." *State* v. *Perez*, supra, 147 Conn. App. 123. In his first motion to sever, the defendant also indicated that he would explain "[t]he context of his involvement" in both the second letter to USA Contractors' bonding company and the expedited payments to USA Contractors. Because there was evidence tending to show that

neither of those courses of action necessarily was unwarranted, it was likely that the defendant would have explained that he undertook them for reasons entirely unrelated to his receipt of a benefit from Costa, thereby negating the state's circumstantial proof of an illegal quid pro quo.[16]

Weighing the defendant's need to testify in one case and his need to refrain from testifying in the other against considerations of judicial economy, we conclude that the trial court's denial of the defendant's first motion to sever was an abuse of discretion because joinder of the cases, at that point in time, caused the defendant substantial prejudice. As we previously noted, the defendant had a strong interest in testifying in the bribery case on the points that he identified, so as to refute the state's case that he had received free home renovations in exchange for his official acts. Furthermore, it is not disputed that the defendant gave adequate reasons for wishing to refrain from testifying in the extortion case. See footnote 8 of this opinion. Insofar as the state had yet begun presenting its case with respect to the charges of larceny by extortion, neither the state nor the court had expended significant resources trying that case. Consequently, the cost to judicial economy of permitting a severance of the charges at that point was relatively low. Because the denial of a free choice to testify in only the bribery case deprived the defendant "of an appreciable chance for an acquittal [on the bribery charge], a chance that [he] would have had in a severed trial"; (internal quotation marks omitted) *United States* v. *Little Dog*, 398 F.3d 1032, 1037 (8th Cir. 2005); the result, in our view, was serious prejudice.

The state contends instead that the trial court properly denied the defendant's first motion to sever because it was insufficiently detailed for the court to evaluate his claim of prejudice. This reasoning, however, ignores the actual basis of the court's ruling. As we previously explained, the trial court, in ruling on the first motion to sever, did not reject the defendant's testimonial proffer as insufficient or even discuss that proffer or address the governing legal standard. Rather, it appears that the court denied the first motion to sever on the basis of untimeliness and the preexisting general presumption in favor of joinder. In any event, the defendant's proffer was sufficient to meet the governing legal standard. Our research reveals that, in the usual case in which a court reviewing a claim that a defendant's right to testify was impaired by joinder rejects that claim due to an insufficient testimonial proffer, it is because the proffer at issue was entirely bereft of information that would have enabled the court to engage in the required balancing of interests.[17] That simply is not the case here.

We are further unconvinced by the state's contention

that the defendant was not prejudiced by the court's ruling because his proposed testimony was insignificant, unbelievable or cumulative to other testimony. As we noted, the defendant's proposed testimony clearly was relevant to the elements of bribery, offering him a reasonable chance of acquittal, and whether it was credible ultimately was a question for the jury. See, e.g., *United States* v. *Sampson*, 385 F.3d 183, 190–93 (2d Cir. 2004) (defendant was prejudiced when proposed testimony could have refuted state's evidence as to his identity as perpetrator of drug sale), cert. denied, 544 U.S. 924, 125 S. Ct. 1642, 161 L. Ed. 2d 483 (2005); cf. *United States* v. *Valentine*, 706 F.2d 282, 291 (10th Cir. 1983) (defendant was not prejudiced when proposed testimony would not have related to element of crime charged). Moreover, it could not be entirely cumulative of testimony already elicited on cross-examination, particularly insofar as it concerned the defendant's own subjective intentions. Although defense counsel's cross-examination of Costa suggested that the defendant would attribute his delayed payment for the home improvement work to his wife's illness and his assisting Costa to reasons unrelated to the home improvement work, there was no substitute for the jury's observation of the defendant's own testimony regarding those matters and any explanations that he may have had. See, e.g., *United States* v. *Jordan*, 112 F.3d 14, 17–18 (1st Cir.) (defendant was prejudiced when proposed testimony as to his subjective intent could have provided good faith defense to tax fraud and false tax return charges, and testimony of his attorney was not effective substitute), cert. denied, 522 U.S. 923, 118 S. Ct. 318, 139 L. Ed. 2d 245 (1997); cf. *United States* v. *Valentine*, supra, 291 (defendant was not prejudiced when his proposed testimony that guns were brought to his residence by third party, whom he had contacted in effort to have them removed, was cumulative of that party's testimony as to same facts). As the defendant himself explained in his first motion to sever, his testimony was "absolutely critical for the jury's complete assessment of . . . his intent . . . [and] because he is the sole source of information on these points."

Saving government resources through judicial economy is a legitimate concern. On the other side of the scale, however, is a defendant's right to a fair trial at which his constitutional right to testify on his own behalf has not been unfairly impeded. As the core jurisprudence in this area recognizes, testifying in one case while remaining silent in another is, in and of itself, prejudicial to a defendant. See, e.g., *Baker* v. *United States*, supra, 401 F.2d 976 (acknowledging "the unfavorable appearance of testifying on one charge while remaining silent on another"); *Cross* v. *United States*, supra, 335 F.2d 989 ("a defendant's silence on one count would be damaging in the face of his express denial of the other"). Notably, the defendant in the present case

consistently and repeatedly fought consolidation and sought severance of the charges against him throughout the trial court proceedings. In recognition of the fact that juries are suspicious of defendants who choose to testify selectively, the defendant ultimately chose to remain silent in both of his cases. If severance had been afforded, his choice would not have been so constrained. In light of the potentially persuasive defense in the bribery case set forth in the defendant's first testimonial proffer, which was timely presented to the court, we conclude that judicial economy should have given way to the defendant's opportunity to present that case to a jury free of the significant prejudice that necessarily flowed from the court's denial of his motion to sever. See *People* v. *Lane*, supra, 56 N.Y.2d 8 ("compromise of a defendant's fundamental right to a fair trial free of undue prejudice as the quid pro quo for the mere expeditious disposition of criminal cases will not be tolerated").

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and McDONALD and ROBINSON, Js., concurred.

[1] The Appellate Court also concluded, as a preliminary matter, that the evidence presented at trial was sufficient to support the defendant's convictions. *State* v. *Perez*, 147 Conn. App. 53, 58, 80 A.3d 103 (2013). In addition, the court concluded that the two cases against the defendant improperly had been joined prior to trial, based on an analysis of the factors identified by this court in *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987). *State* v. *Perez*, supra, 95–96, 100.

[2] We granted the state's petition for certification to appeal, limited to the following issues:

"1. Did the Appellate Court properly determine that the trial court abused its discretion in joining two political corruption cases for trial and that such joinder was not harmless?

"2. Did the Appellate Court properly determine that the trial court's refusal to sever the cases violated the defendant's right to testify in one case while remaining silent in the other?" *State* v. *Perez*, 311 Conn. 920, 920–21, 86 A.3d 468 (2014).

[3] In light of this conclusion, we need not answer the first certified question. See footnote 2 of this opinion.

[4] The defendant was convicted of fabricating evidence as an accessory and as a coconspirator, in connection with the bribery charge. In regard to larceny by extortion, he was convicted both of attempt and conspiracy to commit that crime. He received a total effective sentence of ten years imprisonment, suspended after three years, and three years of probation.

[5] As the opinion of the Appellate Court explains in some detail, the larceny by extortion case against the defendant was predicated on testimony indicating that the defendant had pressured a developer, Joseph Citino, to pay $100,000 to Abraham Giles, a political ally of the defendant, as a prerequisite to Citino's desired purchase of a certain parcel of property from the city. See *State* v. *Perez*, supra, 147 Conn. App. 82–88. For reasons set forth hereinafter, the details of that case are not necessary to an understanding of the severance issue presented by this appeal.

[6] During the interview, the defendant also provided Sullivan with his version of the facts relative to what resulted in the extortion case.

[7] See *State* v. *Boscarino*, 204 Conn. 714, 722–24, 529 A.2d 1260 (1987).

[8] The state does not challenge the validity or legitimacy of the defendant's desire not to testify in the extortion case.

[9] Under the law governing joinder at the time of trial, there existed a presumption in favor of joinder, and the defendant bore the burden of proving that the presumption was rebutted. See, e.g., *State* v. *Davis*, 286 Conn. 17, 28–29, 942 A.2d 373 (2008). Thereafter, in *State* v. *Payne*, 303 Conn. 538, 548, 34 A.3d 370 (2012), we concluded that the blanket presumption in favor of joinder was inappropriate and no longer should be employed,

specifically because it conflicted, in cases involving unrelated charges, with the well established evidentiary principle restricting the admission of evidence of a defendant's other crimes or misconduct. Now, when "the state has moved in the trial court to join [charges set forth in] multiple informations for trial, the state bears the burden of proving that the defendant will not be substantially prejudiced by joinder pursuant to Practice Book § 41-19. The state may satisfy this burden by proving, by a preponderance of the evidence, either that the evidence in the cases is cross admissible or that the defendant will not be unfairly prejudiced . . . ." (Footnote omitted.) Id., 549–50.

[10] In the second motion to sever, the defendant again argued that there was no need for him to testify in the extortion case in light of the recorded interview with Sullivan but that his testimony was necessary in the bribery case "to explain his alleged lies regarding Costa, his delay in paying Costa, his intention of paying Costa earlier in time, and the fact that whatever he did to help Costa was justified on the merits and unrelated to any benefits he may have received." On June 10, 2010, the trial court directed the parties to be prepared to argue the motion the following day, alerting them to relevant case law that the court's recent research had uncovered, and it instructed defense counsel that that case law would require "specific, articulated reasons" supporting the defendant's desire to testify in the bribery case only. Although the defendant had provided such reasons and cited some of the same law referenced by the court in his first motion to sever, and the state had quoted that law in court in opposing the second motion to sever, the court conveyed its belief that the issue regarding the defendant's desire to testify selectively had not been raised previously.

[11] Defense counsel stated: "And so what I had prepared to do, with the court's permission, is to [note] on the record why it is important for the [defendant] to testify [in] the bribery [case], and I will list them seriatim: one, he needs to explain the lies that were made to . . . Sullivan with [the city's corporation counsel] in the room, and he'll testify that he was embarrassed to reveal that he had not paid the bill to . . . Costa with [corporation counsel] present in the room.

"The efforts—he'll testify as to the efforts he had made to do the home improvement project himself, and the fact that he was at . . . Home Depot picking out a product, a countertop product, the fact that he had been to other stores doing that before he got to Home Depot, the fact that . . . Costa came down to Home Depot to see him and advised him that he could do it a lot cheaper, and, thereafter, the defendant will testify [that] he, at . . . Costa's invitation . . . went to his showroom.

"He'll testify as to his historical relationship with . . . Costa as a friend and political supporter that went back many years and that, when . . . Costa was doing the work in his home, he did not view [him] as a contractor for the city . . . doing the work but as a friend, and will admit, if he testifies, that, in retrospect, that was a mistake.

"He will testify that he repeatedly requested a bill from . . . Costa. . . . Costa testified that there was a bill request, but I think his testimony was only on one occasion. But [the defendant] will testify when . . . [his wife] came back home from the hospital and they had a reception for her, he asked [Costa] for a bill, and he asked him for a bill a number of times thereafter.

"He will testify . . . concerning the effect of his wife's illness regarding—regarding his conduct, and how it affected him in terms of concentrating, reading material that might have been available to him, focusing on the bill that was due . . . Costa . . . [and Costa would] say, in light of [the defendant's wife's] illness, there was no hurry on the bill, and [the defendant] was focused on [his wife's] illness and put the payment of the bill on the back burner and really did not think there was any immediacy to pay it, although he had every intention to pay it.

"Furthermore, his problem, [in] terms of focus and the problems with the bill, was tremendously compounded by [his health insurer's] refusal to pay the medical bills for the doctor in New York at Columbia Presbyterian Hospital, and he would receive bill after bill from Medicare, [the health insurer] showing large balances that were due; and this—and this caused him to realize that he might have to get a major loan, not [a] $20,000 loan, but a major loan, not only to pay for the medical bills, but also to pay . . . Costa. And the medical bills just—were not resolved for a long period of time after [his wife's] surgery.

"He will further testify [about] his lack of involvement in the home improvement project and that, principally . . . Costa interacted with [the defendant's wife] and that he had little, if anything, to do with it because, most of the time, he was off and running at city hall, getting home late in

the day from his school board duties and his many, many obligations as the mayor of the city . . . . And he seldom saw . . . Costa at the house or his work[ers] at the house.

"He'll further testify that he—when he asked . . . Costa for the bill . . . Costa told him that it was going to run between $26,000 and $28,000, and he was stunned by that amount. And he'll testify concerning that, in support of his claim, that he had every intention to pay the bill, otherwise he would not have been stunned by the amount that . . . Costa quoted him.

"He'll testify that when he finally got the bill from . . . Costa, he did not read the bill; he did not analyze the bill. He simply saw that the amount was $20,000 plus, and he was relieved that it wasn't $26,000 or $28,000. And there was no knowledge, on his part, that the bill was incomplete and misleading, or whatever. He just saw that number, $20,000, and he was pleased that it was—it was in that ballpark.

"He'll testify that the decision to turn over the bill—the invoice, through counsel, to the Office of the Chief State's Attorney was in no way intended to mislead the state; it simply was in an attempt to show the state what [it] asked for, which was the bill he received from . . . Costa.

"He'll further testify . . . that his involvement with Costa regarding the . . . [city construction] project—he'll further testify concerning his decision to get [the director of capital projects] involved in the project. He'll testify as to the project's delay, and that it was an important project to him for many reasons. Once it was—it was a project to benefit the Latino community, of which he was obviously a part and a leader, and also a source of pride to be able to develop something that had not been developed over the years by any predecessor mayors.

"He'll testify concerning his decision to accept and follow . . . [the] decision or recommendation [of the director of capital projects] to send the [second] letter to [USA Contractors' bonding company], and he will deny that accusation made by [a public works official] that there was an episode in his office where he was shaking a letter and saying what the F is this; that never occurred, he will testify in his own defense.

"He will further testify that his decision not to assist . . . Costa in his quest for the payment of claims and extras, and many of which were detailed in the lawsuit and other documents, that he did not, in any way, participate to help . . . Costa get those paid.

"He'll testify about his concern of a delay on the [city construction] project—if the project were delayed by terminating . . . Costa, and the tremendous problems it would cause [the defendant], not only in his service to the Latino community, but also politically by the reaction among the merchants and other people who were interested in the project.

"He will further testify that there were many more projects and issues that required his time and attention during the . . . period of time [between 2005 and 2007] when [the city construction project] was going on, including the school building projects, the library construction controversy, and the issues of violent crime in the city . . . and that, when compared . . . with these problems . . . the [city construction] project was a minor project in terms of his priorities [for] the city . . . and the enormity of the other projects that he was involved in, including the eleven school projects, which were budgeted at between $400,000 and $5,000,000.

"He will further testify that the—that [the] practice of supporting businessmen like minority businessmen or contractors, like USA Contractors, was one of [the defendant's] top priorities as a mayor and as a candidate for mayor, and, in following through with that commitment, he would make efforts to make sure that they got their approved invoices paid in a timely manner out of the treasurer's office.

"He will testify as to the reasons he took to help [to] get some of . . . Costa's approved invoices paid. He will testify that he devoted his life to public service and further testify that he is not interested in worldly possessions or the accumulation of wealth or other material things.

"He will also testify that his religious convictions guide his conduct, and those convictions would not, in any way, permit him to accept a bribe or to do anything that not only—or to fabricate evidence, or anything else that would violate his moral code."

Defense counsel also explained in greater detail why the defendant did not want to testify in the extortion case, an explanation which the state has conceded was adequate.

[12] Appellate jurisprudence construing Connecticut's bribery statute is sparse. The federal statute prohibiting bribery of a public official is similar, however, providing in relevant part that, "[w]hoever . . . (2) being a public

official . . . directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for: (A) being influenced in the performance of any official act," shall be fined or imprisoned, or both, and may be disqualified from holding public office. 18 U.S.C. § 201 (b) (2012).

[13] It appears from the record that the trial court did not fully appreciate this until it was considering the defendant's second motion to sever, although the defendant clearly had argued it earlier and cited the applicable legal standard in his first motion to sever. See footnote 10 of this opinion. If the court had expressed a concern that the proffer was inadequate, the defense, in all likelihood, would have detailed further the defendant's intended testimony as defense counsel ultimately did upon the court's later request, which appears to have been prompted by the court's closer review of the governing case law.

[14] Practice Book § 41-18 provides: "If it appears that a defendant is prejudiced by a joinder of offenses, the judicial authority may, upon its own motion or the motion of the defendant, order separate trials of the counts or provide whatever other relief justice may require." The provision contains no time limitation. Furthermore, in *State* v. *Chance*, 236 Conn. 31, 671 A.2d 323 (1996), we acknowledged that a defendant may be unable to make a decision about whether to testify at the outset of a consolidated trial but that, if his intention to testify becomes clear during the course of that trial, he can and should convey that intention to the trial court through a renewed objection to consolidation claiming deprivation of a meaningful choice as to whether to testify. See id., 47–48.

[15] The defendant's proffered testimony also could have undermined the state's proof with respect to the charges of fabricating physical evidence. See General Statutes § 53a-155 (a) (2).

[16] As we previously indicated, Costa had an entirely different view from the department with respect to the reasons for USA Contractors' inability to perform the city construction project within the time allotted by the contract. Conceivably, the defendant shared some or all of this view, or had other reasons for wishing to keep Costa on the job despite issues with his company's performance. Additionally, there was evidence presented at trial that the city, approximately two years prior to the events in question, had changed its charter, resulting in a "strong-mayor form of municipal government." *State* v. *Perez*, supra, 147 Conn. App. 57 n.1. Pursuant thereto, the mayor was not, as he was previously, merely "the head of the [city] council, more of . . . a ceremonial position . . . ." (Internal quotation marks omitted.) Id. Rather, he appointed, and possessed "real power" over, all department heads. (Internal quotation marks omitted.) Id. Presumably, then, he was entitled to second-guess their decisions.

[17] See, e.g., *United States* v. *Ervin*, 540 F.3d 623, 629 (7th Cir. 2008) (defendant "merely stated that he 'wish[ed] to testify' in his own defense against the homicide counts, but '[t]hat combining all the counts at one trial' would prevent him from doing so"), cert. denied sub nom. *Zambrana* v. *United States*, 555 U.S. 1149, 129 S. Ct. 1030, 173 L. Ed. 2d 315 (2009); *United States* v. *Little Dog*, supra, 398 F.3d 1037 (defendant simply "contend[ed] he was prejudiced because he did not want to testify [with respect to an] obstruction charge but did want to testify [with respect] to . . . sexual [abuse and contact] charges"); *United States* v. *Bowker*, 372 F.3d 365, 385 (6th Cir. 2004) (defendant's motion to sever "stat[ed] only that his testimony was 'anticipated to be crucial' [on two counts] because these crimes have a specific intent requirement," whereas testimony on other count was " 'not needed' " due to lack of such requirement), vacated on other grounds, 543 U.S. 1182, 125 S. Ct. 1420, 161 L. Ed. 2d 181 (2005); *United States* v. *Utley*, 62 Fed. Appx. 833, 836 (10th Cir. 2003) (defendant asserted only "that he 'may wish to testify at trial as to one or more counts, but not as to all' "); *United States* v. *Balzano*, 916 F.2d 1273, 1280, 1284 (7th Cir. 1990) (defendant's "assert[ion] that severance was required because it was his intention to testify only [with respect to] the witness intimidation count and not to testify [as to] any of the remaining counts" was " 'nothing more than . . . a bald allegation of a mere possibility that [he] would give exculpatory evidence in a severed proceeding' "); *United States* v. *Possick*, 849 F.2d 332, 338 (8th Cir. 1988) (defendant "simply claimed [as to continuing criminal enterprise charge, that] he was 'not a kingpin [and] did not supervise five or more persons [or] obtain substantial income' "); *United States* v. *Hernandez*, 829 F.2d 988, 991 (10th Cir. 1987) (defendant's affidavit "simply stated his belief that he had a valid defense to [one count], the fact that he *might* testify as to [that count], and his belief that the testimony given as

to [that count] would incriminate him as to the other counts," and, at hearing on motion to sever, defense counsel "cryptically noted" that testimony would relate to certain elements of identified count [emphasis in original]), cert. denied, 485 U.S. 1013, 108 S. Ct. 1486, 99 L. Ed. 2d 714 (1988); *United States* v. *Scivola*, 766 F.2d 37, 39–40, 43 (1st Cir. 1985) (defendant claimed only that he wanted to testify in his own behalf as to one count but not as to other without specifying what testimony he would have given); *United States* v. *Corbin*, 734 F.2d 643, 649 (11th Cir. 1984) (defendants did "no more than express a generalized desire to testify as to some counts but not others" and "[did] not [indicate] what they would have testified to, and whether such testimony would have been of any particular importance"); *United States* v. *Reicherter*, 647 F.2d 397, 401 (3d Cir. 1981) (defendant stated simply that he intended to present alibi defense, without even specifying that he would testify); *United States ex rel. Tarallo* v. *LaVallee*, 433 F.2d 4, 5–6 (2d Cir. 1970) (defendant's motion to sever presented fact that he had to make election between testifying as to one robbery charge or another but "not that he was confronted with a dilemma fraught with prejudice"), cert. denied sub nom. *Tarallo* v. *LaVallee*, 403 U.S. 919, 91 S. Ct. 2235, 29 L. Ed. 2d 697 (1971).